They please the court, Krishna Balasubramani on behalf of the appellants BJY, Inc. and Greg Young. There are three issues I hope to address before the court today. One is whether or not the district court erred in characterizing the use of a non-Arab Western nickname as a racial act. The second is whether substantial evidence supports the jury's finding of a hostile work environment. And third, whether the trial court erred in failing to apportion the attorney fees that were awarded between two separate claims for relief on which two different defendants were found liable. By way of quick background, there were 13 claims for relief. Plaintiff prevailed on two claims. One was a claim under Section 1981 on which Defendant Young, the CEO of BJY, was found liable of creating a hostile work environment. On post-trial motions, the judge found that Defendant BJY, Inc. was vicariously liable for his actions. And then the second was a verdict on an Oregon State claim for this claim was against only BJY, Inc. and that verdict is not being challenged here today. The operative facts are essentially that the CEO of the company, Greg Young, who was based in Texas, despite Mr. L. Hockham's objections, continued to call him by the name and race and the fact that there was a Jewish connotation to the name. The first issue I'd like to raise is the court's analysis under Section 1981 and the primary case is the St. Francis College 1987 decision from the Supreme Court, which says that targets of race discrimination for the purpose of Section 1981 includes groups that today are considered merely different ethnic or national groups such as Arabs, Jews, Germans, and Italians. But the Supreme Court also mentions in that decision that the respondent on remand had to prove that he was subject to intentional discrimination based on the fact that he was born an Arab rather than a place or nation of his origin or his religion. And later the case discusses the fact that Section 1981 is to protect people who are subjected to intentional discrimination solely based on their ancestry or ethnic characteristics. So are you disputing that the plaintiff in this case was treated differently because of his ethnicity? Correct. And what is your basis for that argument? Well, the court's analysis of it was comparing Eastern versus Western cultures almost was what the jury instruction came down to and that's one of the areas of dispute. What was the instruction exactly? The instruction And what is it in the record? In the excerpt of record, it is ER 15, which says defendants subjected plaintiff to verbal or other conduct of a racial nature by addressing him after his objection by a non-Arab Western name. Well, doesn't that corral all of the relevant circumstances? It didn't just say Eastern versus Western. It mentioned race and ethnicity. What's wrong with that? Well, it also mentions Western. So the supposition in there is that somehow the use of a Western name is a violation against a person's ethnic or Arab characteristics. And a name unlike, you know, the manner of your hair or the way of your eyes or your pronunciation or your color of your skin, a person's name is not a racial or ethnic characteristic. So you're aware that during slavery, one of the first things the slaveholders did was remove the African names and insert an American name. You wouldn't consider that as being racially motivated? Well, the slavery itself was racially motivated and it was Wasn't that an incident of slavery? It was certainly an incident of slavery. And so you wouldn't consider that to be racially motivated? Well, in that particular instance, the facts are obviously that it's racially motivated. The facts in this case dealt with the pronunciation of a name and a misguided belief, albeit, that the client's inability to pronounce a variety of Eastern names was going to make it difficult. And that's not a justification. I'm just saying the facts aren't as clear as taking all Arabs, and this is a company that had Arabs as vice presidents and Arabs as in high-ranking positions, and simply taking his characteristic as an Arab and discriminating against him. Because all of the facts How do you work into your analysis the fact that he protested the use of the nickname on the basis that that was offensive to him? He protested it, but he protested it on a variety of basis, including his religious grounds. And on the religious grounds, Section 1981 doesn't cover it. And on the Title VII claim against the company, the jury found that there was no violation based on his religion. He didn't ever protest it based on ethnicity, only on religion? His testimony was that it was sort of co-mingled. He talked about his Egyptian, which is not necessarily Arab. So he talked about Arab, he talked about Egyptian, he talked about his Muslim religion, and he protested on those basis. And our concern is that the basis for liability for the individual defendant is very narrow. So this isn't a case where it's whether it was Arab or Egyptian or Muslim that was the basis for the discrimination. There's a valid claim. This is a more narrow claim because, again, the Title VII claim or the religious discrimination claim against the company, plaintiffs did not prevail on that claim. And so given the nature of the limited coverage of Section 1981 and the appeal that the judge should have more clearly defined the jury instructions and the verdict form, instead of simply suggesting to the jury that the use of a different name itself was automatically racially motivated, as long as Why should the instruction have read? I think the court should have clarified to the jury the distinction between the racial distinction and the religious discrimination and said that the plaintiff needed to establish that Mr. Young changed Mr. L. Hawkins' name because of his race or because of his ethnicity without adding in the cultural issue of a Western name. Okay. What case authority are you relying upon for your assertion of error? I could find very few cases on 1981 itself addressing a similar issue, so I don't have a case on either side on that issue. What's our standard of review for jury instructions? It's cited in the brief here and it's The judge has wide latitude in framing jury instructions. Would you agree? Yeah. And so are you saying that the judge abused his discretion? I think simply because of the nature of this case. And if there wasn't an issue of experts coming forth talking about religious discrimination and one defendant liable solely if there's a finding of race discrimination and another defendant liable for race or religious discrimination, given the narrow confines of this case, I think the judge abused the discretion in using that. In light of your recognition that there are very few cases that would lay the issues out the way you have, and in view of the court's wide latitude, how can we say that there was error? There are no cases on either side of this issue of how broad is on a nickname type theory, is a name a racial characteristic or is it a cultural characteristic? That issue, there weren't any cases on, so there was very little guidance in terms of trying to frame the issue. Basically, our discussion seemed to focus down on the St. Francis case. There are cases that say if conduct is ethically tinged and it's objected to, that the employer is walking a pretty fine line in continuing that conduct. Wouldn't you agree with that? I would agree with that. I would agree with that. And doesn't this jury instruction embody that philosophy? But then it goes too far, is I guess our position, including the cultural issue beyond the racial issue. If the jury instruction simply said defendant subjected plaintiff to verbal or other conduct of a racial nature by addressing him with a nickname over his objection, it doesn't bring in to a jury that's being asked to really draw this fine line between race, ethnicity versus religion. So if the jury instruction deleted Western name, you would have no objection to it? That was our primary concern and remains our primary concern. It was an implication that simply by using a Western name, the defendant engaged in conduct that was racial in nature.  So in other words, you're talking about an Egyptian Muslim Arab and that gets translated to race. How did that come about? In other words, that's a fairly fuzzy approach. And how did the race part of it get presented to the jury? My view of it is the experts are two experts who testified in terms of their experts on Muslim religion, but also generically talked about the Middle East and Middle East conflicts. And there wasn't a lot of separation in terms of race or religion because there was no race experts separately called. It was religious experts called to say that based on the Koran, the name given to a person is very important to them. And people who follow the Koran should not accept nicknames or the name has real identity to them. And that was really the heart of the testimony, even though the experts sometimes co-mingled the ethnicity issue, the race issue, and the religion issue. You don't contest that Egyptian is a specific race, do you? A race of people? Not under Section 1981. Well, the St. Francis case talks about Arabs and Jews and Germans and Italians, but doesn't talk about it in terms of countries of origin. And the court cautions that the respondent on remand in the St. Francis case had to prove intentional discrimination based on his Arabic descent rather than the place or nation of his origin. And that line is so thin I'm not sure I can put words in terms of if 1981 covers Arabs, Jews, Germans, and Italians, but a plaintiff has to distinguish that versus place or nation of origin, it seems like it comes really close to a national origin claim. But the court also specifically seems to say this isn't just a national origin issue, but we are recognizing that races aren't simply Caucasians and three or four races, that other cultures have gained the identity of. There was no challenge to the plaintiff as being of Arab origin. The race issue was never challenged by the employer, was it? No, no. He's clearly of Arab descent and he was born in Egypt. Isn't there an element in this case, one ground for the plaintiff's objection to the use of the name Manny, that there's a Jewish connotation to the use of that name frequently used in the Jewish context and that that was an insult to him and so that would be an ethnic basis for his claim? That would be an ethnic basis for his claim, but again, we're talking about a name. One of the things we discussed is the names are so changeable, and Your Honor pointed to instances in which names are involuntarily changed. But is the theory that if a person of American descent becomes Muslim, adopts a Muslim name, and then that that person's name is changed, the same set of facts where- Not changed by him, changed by his employer against his will. Well, correct, but the question is if, or the issue I'm raising is if you adopt a Muslim name and you're Caucasian in descent and an employer calls you by a nickname, is that racial or ethnic discrimination? Depends on the nickname. I'm sorry? I suppose it depends on the nickname. If it's a derogatory nickname in the eyes of the recipient of the fellow that's being called that name, then I suppose it is. Does that make it racial or ethnic if the person is Caucasian and born in America? Because the testimony was basically that the employer's misguided conduct was based on the name, not based on where this person was from or what his religion was, even though that was the basis for the plaintiff's complaints. The employer's actions were widespread. There was testimony in terms of people of all different cultures were given Western nicknames. And, again, I'm not necessarily defending the actions, obviously, but whether or not that conduct is racial in nature. An equal opportunity offender is not a defense. No, but if it's not a violation in any of the instances because it's not a race-based action. We don't know that. That evidence was presented to the jury, and the jury rejected it, right? The jury found in plaintiff's favor. I think that the instruction that you read to us, including the word Western, was objected to before the district court? Yes. Did you make the suggestion that Western be omitted? I believe that was our final request was just that the two words be dropped as the instruction was sufficient as it were. The next issue, real briefly, it's a substantial evidence issue. One of the reasons to be brief, but simply the question of whether or not the use of a nickname, even if the plaintiff objected, is sufficient to create a hostile work environment. One of the interesting parts of this case is there was a concession that the conduct was not severe. And the question was, was the conduct pervasive? And if you're talking about conduct that is not severe, creating a hostile work environment because the conduct is becoming pervasive, it seems we're getting really close to the civility code that the courts always caution that the civil rights laws are not. And this was an issue that we tried to get raised in a jury instruction, and the court said, well, no, it's more appropriate for legal consideration, the fact that section 1981 is not a civility code, but then isn't addressed in detail within the court's post-trial orders. And there's plenty of cases talking about racial epithets not being sufficient to create a hostile work environment. One of the cases cited is the Manette versus Bank of America Ninth Circuit decision from 2003, which contains language that I can't even get myself to say in open court. Now, one of the factors that the Ninth Circuit relied on in the Manette case was that the conduct only happened on, I think, two reported incidents, but on those two reported incidents, the terms such as China woman and things like that were repeated multiple, multiple times. And the Ninth Circuit said, you know, it's disgraceful, but it's simple teasing, offhanded comments, and it doesn't have the level of severity. Are those done in the face of objections? Are those comments made in the face of objections to those comments? I cannot tell. That's not discussed from the decision. Well, you agree it's a little different if the offending conduct is repeated after being objected to? I agree it's a little bit different, yeah. But still the question of if you take a conduct that's not severe, if it's objected to, does that then allow an employee to show violation just based on pervasive action? Pervasive is a little different, has a little different connotation to me if it continues in the face of objection, as opposed to whether or not it's isolated in the absence of objection. Yes. And our position is simply that if it's not severe, can you really ever have a hostile work environment claim, no matter how severe or how much you object? You know, it's wrong, it's distasteful, it's disgraceful, but is it a hostile work environment when there's no severity? So you would read out the pervasiveness issue? No. I would say you need to have some element of severeness and pervasiveness. If you concede it's not severe, no matter how pervasive it is, it's not actionable. Doesn't the case law say severe or pervasive? The case law says severe or pervasive, but the discussion is that it's sort of an inverse, and I wasn't able to find any cases that said if there's enough pervasiveness, there can be no severity. Little things can become big things over time if they last long enough. And, of course, the subjective nature of the plaintiff's response to the name Manny was presented to the jury. I think that they had to find that an objective person in his position would have found that to be objectionable. So it got by the subjective and into the objective. How do you get around that? I would agree. I don't think that one person's reaction to a nickname ought to create the right to sue unless there's an objective element. It's objectively objectionable. And where is the objectively objectionable? The testimony from the experts was based as much on the Muslim religion as it was on the race and cultural issues. But can you really divide them in this case? That's the problem. We have to divide it, don't we, into Section 1981. You perhaps do, but I'm not sure you're going to get a bright line from either the experts or from the courts when you're talking about Arab Muslims because the ethnicity and the religion are so mixed. Except that's an extension of the St. Francis case if we're going to go from race to include it. Now, if this was simply a Title VII case against the employer, I probably wouldn't be standing here. But the fact that there is one distinct claim against Section 1981, which is the only claim on which the individual is liable for, requires us to try and draw that fuzzy line, which makes it difficult given the issues Your Honor just raised. I'm out of time. We'll give you one minute. Okay, thank you. Thank you. The final issue to address is the attorney fee issue. We're relying on the Jones v. Espy case, a Ninth Circuit 1993 decision. What we have here is Mr. Young liable under the 1983. So if you could wrap up, you've exceeded your time. So if you could wrap up in the next minute. Okay. Our basic position is that the judge erred in allowing the plaintiff to wrap together a general litigation. After concluding that the two claims were factually and legally distinct, the judge allowed the plaintiff's attorney to put 90% to 95% of all of the attorney fees claimed within the general litigation category, which we believe was inappropriate and unfair to Mr. Young, who is being forced to pay attorney fees arising out of the wage claim to which he was not a party. All right. Thank you, counsel. May it please the Court, I'm Craig Crispin on behalf of the plaintiff, Mamda Al-Hakam. And let me address first the identity in the facts of this case between race and the Muslim religion. The experts that testified, Dr. Socker, explained the kind of identity that at least in this country we perceive as Arab Muslim, and Your Honor just mentioned or used those terms together. In the facts of this case, an Arab Muslim is an Arab. A Muslim may not be an Arab, but an Arab who is a Muslim or a Muslim who is an Arab are lumped together in general perception. Mr. Young, in fact, when he first used the word or name Manny to refer to Mr. Al-Hakam, once the plaintiff objected and raised the aspect of his objections as including his cultural language and heritage, you can see those in the excerpts of record, the supplemental excerpts of 17 and 19, where he raises those objections on those basis. And Mr. Young continues to use that phrase afterwards when he has to assume that he took into account and then ignored the kinds of complaints that Mr. Al-Hakam was raising, so that his subsequent use of the term Manny to Mr. Al-Hakam was in light of his being told that this is a matter of culture and language and heritage, altogether being the ethnicity that we see in the St. Francis case. I think it's important to look at the jury instruction as well that counsel was talking about, the excerpt of record 15. And the critical aspect of that instruction is that the phrase that the jury has to find first, the racial aspect of the comment. And we see that the instruction is that they must find that the defendant subjected the plaintiff to verbal or other conduct of a racial nature. And then they go after and say that by addressing him by a non-Arab Western name. So the jury was instructed that this was a racial matter. They had to find racial aspects of the non-Arab Western name before they could reach that conclusion it was in fact racial. Counsel, what's your response to opposing counsel's argument that by including the two words Western name, the court broadened the inquiry beyond what is permissible? I think that's just trying to speak to that, is that the jury was instructed first to find racial connotations in the use of the nickname or the Western name. And as evidence unfolded at trial, there was a lot of discussion about Arabs and Middle Eastern people lumped in a group versus those in Western, and Western sounding names. And the distinction was always based on this group of Arab Muslims as having these names that nobody could pronounce, according to Mr. Young, or that he had trouble pronouncing. And so the Western name in the context of the evidence of this trial was versus two Eastern groups. One was the Arab Muslims, and the other was this group of individuals in Eastern Europe, whose names were also allegedly difficult to pronounce, and he gave them nicknames. They would qualify as ethnic groups under the St. Francis case, as well as the Arab Muslims who we're talking about here as well. Did I answer your question? Yes. Thank you. It's important to note also that the pervasiveness of the court's comments were right on point in terms of severe or pervasive, and that's been consistent throughout the cases, is that there need not be the severity as long as there is the pervasiveness. Counsel, did you concede the lack of severity? We agreed that the conduct did not rise to a level that one would say we rely upon severity as the basis for this claim, primarily because we had such a pervasive record. Mr. Christensen, one of the managers from the company, testified, supplemental record 72, that the use of the word Manny was all the time. Mr. Al-Hakim indicated that once he raised it, it came out over a couple of months, at least once a week, and then all the emails. He talked about all the emails. He talked about it, excerpt from record 97, that he had much contact with Greg Young throughout the course of the day and that he always used the word or term Manny to refer to him. I also wanted to mention that Mr. Young himself, and perhaps I slipped the tongue, but one might be telling, at page 77 of the supplemental excerpt, lumped Arabs together with regard to Middle Eastern. He kind of made a phrase that Middle Easterns, I mean Arabs, kind of thing like that, so indicating that he, in his own mind, still equated those two. Also, there was testimony about the Eastern and Western name as being a policy, which I think is significant when you're looking at the two identifiable racial groups under St. Francis that was affected. Once the company policy was that way, and that's in supplemental excerpt 73, that was something that indicates this is not an inadvertent kind of thing that happened once or twice, but in fact was indeed pervasive. I'll mention also the apportionment of fees issue. The court did a couple things in looking at the fees. The court agreed that in trying a case, there are a lot of hours that are spent in trying the case that are either the same regardless of the different issues or that cannot be segregated because you do the same thing anyway. The court cut fees by 20% to account for some of the lack of segregation. The court had the discretion to look at the way the case was tried, to look at the submissions, and to identify what kind of apportionment was involved. The court said that the wage claim was a very simple claim that really required virtually very few hours to develop. It was clear cut, not factually complex. It was simply putting in the evidence of the pay, a few questions about not getting paid, and that was it. So she decided not to do the apportionment because by reducing the fees by 20%, she was assuming that whatever minor difference might have been involved there. Turning to our issue we raised, the plaintiff raised in terms of the jury verdict, the jury found that a substantial motivating factor for the termination of a plaintiff was that he had brought a wage claim. And the testimony and evidence shows that he had contacted his immediate supervisor. He had gone to a vice president, Wedman, finally called Mr. Young himself about non-payment of wages and a dispute over wages. He also went to the Oregon Bureau of Labor and Industry and contacted them, made an appointment, came back and told his supervisor that he in fact made an appointment to go see Wage and Hour concerning these unpaid wages. He then had a conversation with Mr. Young and complained about the non-payment of wages, whereupon the next day he was terminated. The jury found that there was a substantial motivating factor. What the jury then went on to do is say that the employer would have terminated Mr. El-Hakim in any event based on other factors. Our problem with this defense, the same decision defense, is that it had not been raised even to the point of the middle of the trial. And this is an affirmative defense. Isn't it an affirmative defense? When you say – Isn't it a burden on the plaintiff? I'm sorry? Isn't it a burden on the plaintiff? The burden is to show the substantial motivation, Your Honor. And once that is done, the defendant has the right to come back and try to argue that it would have done the same thing anyway. It's in the nature of an avoidance once we show a substantial factor in the termination. So the judge, by allowing this new defense after, of course, all the discovery had been done, trial preparation had begun, abused your discretion in doing that. And that's our point on that one. The second point that goes along with that is that even if the same decision defense was appropriately involved, given to the jury, we still have a violation. We have a violation that's established. And the question then becomes, what does that do? We're not operating under Title VII, the amendments to Title VII, which deal with the same decision. But if you look at that by analogy, there remain some limited remedies available there. But even without looking at that, what we've got is a statutory or a statutory prohibition against terminating somebody because they've raised wage complaints and no remedy. Once the discrimination and retaliation occurs by the termination, the damage has been done. And even if the back pay is cut off at that point, we'd submit that the appropriate remedy is that the plaintiff, in fact, received compensation for the emotional general damages for the aspect that is not cut off by the same decision. Counsel, under the same decision defense issue, didn't the Oregon Court of Appeal in Hardy v. Legacy say that the plaintiff has to show that he or she would not have been fired but for the unlawful discriminatory motive of the employer? Doesn't that make that part of the plaintiff's burden of proof? Let me turn to that, if I might, Your Honor. That is the basis on which Judge Brown reached her conclusion. And we don't believe it applies because the standard for the retaliation is a but-for standard. And once the jury answered the question that termination was, in fact, in violation, it's the same standard as that applied in Hardy. Well, would you agree, though, that Hardy does make that ruling, that it's the plaintiff's burden to prove that but-for discrimination? That's the language used in Hardy, yes, Your Honor. And so aren't we bound by the state court's interpretation of its statutes? We are, but I don't think that is an interpretation that has substance to it. But for because of these are standards that the case in Hardy did not focus on whether this is a matter that overcomes some other possible reason. Well, normally it would be the employer's burden to show that he would have made the same decision. But in Hardy, that burden is imposed upon the plaintiff, which is unusual. But that's what the case says. So why doesn't it mean what it says? It very well may mean what it says. In this case, we asked the jury, if the plaintiff had established his case, and the jury instructions gave the appropriate burden to prove. They said, yes, it did. Then they went on and said, is this the same decision? Which, number one, of course, we say is an abuse of discretion to allow to go in. Once the question is answered, the second question doesn't vitiate the fact that the initial question on liability has been answered. Absent something like Title VII or absent some specific case law that says in Oregon you've got to have more than a finding of liability. And we relied, in the brief, and I won't go over it again, I'm sure that it's been read, we relied upon the findings or the case in Brown v. American Property Management based on what are the motivations. I think our brief addresses the points that I have on that. If there's no other questions, I'll sit down. Thank you, counsel. Thank you. We'll give you one minute for rebuttal, counsel. I want to read a short section in terms of plaintiff's testimony, in terms of this is in the supplement of record, page 20. He's talking about an email that wasn't produced, talking about the name. I replied in the same email to Mr. Young, telling him that I'm proud using my name, Mamdouh, and this name, part of my religion, part of my entity, part of my culture. It is the same name that identified me. It is in my culture as a Muslim person, and I not change my name. And that's the end of it. And so there's lots of testimony in the record about the culture, the religion being the real factor. And in terms of the same decision defense, I'll just simply rely on the brief unless I can answer any questions. Thank you, counsel. Thank you to both counsel. The case just argued and submitted for a decision by the court. We will be in recess for 10 minutes. All rise. The court stands in recess for 10 minutes.
judges: T.G. Nelson, Rawlinson, Pollak